## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **U N I T E D   S T A T E S   O F AMERICA,** | : | |
| | : | |
| | : | **CRIMINAL ACTION FILE NO.** |
| **v.** | : | **1:17-CR-00316-MHC-AJB** |
| | : | |
| **RYAN JUWARN REMBERT,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES MAGISTRATE JUDGE'S
## <u>FINAL REPORT AND RECOMMENDATION</u>

This matter is before the court on the defendant Ryan Juwarn Rembert's motions

to suppress evidence and statements [Doc. Nos. 17, 18, 26, 27].  The defendant is

charged in a three-count indictment with (1) possession of a firearm by a felon;

(2) possession with intent to distribute marijuana; and (3) possession of a firearm in

furtherance of a drug trafficking crime.  The charges are based on a traffic stop and

ensuing arrest of the defendant on March 20, 2017.  The government also intends to

present statements and evidence from a previous traffic stop involving the defendant

on November 28, 2016, under Federal Rule of Evidence 404(b)[1] (evidence of crimes,

---

[1]      Federal Evidence Rule 404(b) permits the admission of prior-bad-acts evidence
to show motive, preparation, knowledge, and intent, as well as an ongoing scheme or
plan.  Fed. R. Evid. 404(b); *United States v. Lehder-Rivas*, 955 F.2d 1510, 1515-16
(11th Cir. 1992); *United States v. Cross*, 928 F.2d 1030, 1047-48 (11th Cir. 1991).

AO 72A
(Rev.8/8
2)

wrongs, or other acts), and from the defendant's arrest on October 12, 2017, which was made pursuant to the arrest warrant issued on the instant federal charges against the defendant.  The defendant has moved to suppress statements and evidence from all three instances based on violations of the Fourth and Fifth Amendments to the United States Constitution.  [Docs. 17, 18, 26, 27].

Having reviewed the evidence and the parties' briefing, and having held evidentiary hearings on the instant motions, the undersigned makes the following recommendation.

## I.   Procedural Background

On September 6, 2017, the defendant was named in a federal indictment, charging him with three counts: (1) possession of a firearm by a felon, 18 U.S.C. § 922(g)(1); (2) possession with intent to distribute marijuana, 21 U.S.C. §§ 841(a)(1) and (b)(1)(D); and (3) possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c).  The defendant has moved to suppress evidence and statements from three incidents: a traffic stop and arrest on November 2016; a traffic stop and arrest on March 20, 2017 (the basis of the instant indictment); and his arrest and interview on October 12, 2017.  [Docs. 17, 18, 26, 27].  The court held evidentiary hearings on the defendant's motions on May 11 and June 13, 2018, which included the

2

testimony of several witnesses, and the parties have since fully briefed the facts and issues to be considered for the defendant's motions.

## II.     Factual Background

### A.       The November 28, 2016 Traffic Stop and Arrest

On November 28, 2016, around 11:00 p.m., College Park Police Department Officer Anthony Paniagua was on duty and stopped at a traffic light behind a 2002 Honda Civic being driven by the defendant.  [Doc. 56 at 105-07].  He ran a random check on that tag, which revealed that it was expired (a violation of Georgia law). [Doc. 56 at 106, 109-10].  Officer Paniagua then initiated a traffic stop.  [Doc. 56 at 110-12].  He radioed the stop to dispatch and activated his police lights, which also activated the camera recording equipment in the patrol car.  [Doc. 56 at 110, 112-13]. Officer Paniagua was not wearing a microphone during the traffic stop, so while the stop was recorded on video, the only audio source of the recording was inside the patrol car.  [Doc. 56 at 113-14; Govt. Ex. 8].

Because Officer Paniagua saw multiple passengers in the Honda, he called for a back-up officer to assist him.  [Doc. 56 at 110-12].  He then approached the Honda, notified the defendant of the reason for the stop, and asked for the defendant's driver's license, which he provided.  [Doc. 56 at 111, 115; Govt. Ex. 8 at 22:50:30-22:50:50].

AO 72A
(Rev.8/8
2)

While standing next to the driver's rolled-down window, Officer Paniagua smelled a "very strong smell" of unburned marijuana coming from the car.  [Doc. 56 at 116-17]. Officer Paniagua returned to his patrol car to run the defendant's driver's license and learned that the defendant's license was suspended.  [Doc. 56 at 117; Govt. Ex. 8 at 22:51:13].  The officer advised the defendant that his license was suspended, placed him under arrest, and conducted a pat-down search.  [Doc. No. 56 at 118; Govt. Ex. 8 at 22:52:47-22:54:48].  The search did not reveal any contraband on the defendant's person.  [Doc. 56 at 118, 127].  Officer Paniagua did not at that time, or any other, advise the defendant of his *Miranda* rights, and the defendant was placed in the back of  Officer Paniagua's patrol car.  [Doc. 56 at 118-19].  The defendant asked Officer Paniagua if one of the passengers, Damien, could take the Honda.  [Doc. 56 at 119; Govt. Ex. 8 at 22:54:53-22:55:05].

Two other officers arrived as Officer Paniagua's back-up: Officer Garrett and Sergeant Stroud.   [Doc. 56 at 117, 119, 126-27; Govt. Ex. 8 at 22:52:47, 22:53:49]. Based on the smell of marijuana, Officer Paniagua and Officer Garrett searched the car while Sergeant Stroud watched the two passengers who were off to the side.  [Doc. 56 at 119-20; Govt. Ex. 8 at 22:55:50-22:58:55].   No marijuana or drug-related paraphernalia was found in the Honda, but the officers did find a Glock firearm inside

4

the unlocked glove box. [Doc. 56 at 119-21].  Officer Paniagua asked the passengers if the firearm was theirs, which they denied, and he then asked the defendant, "is this your Glock?" [Govt. Ex. 8 at 22:59:04].  The defendant responded "nah, nah, that's my cousin's car," and then asked if the officer would let "Damien drive my car." [Govt. Ex. 8 at 22:59:06-22:59:12].  Officer Paniagua said "yeah," and then informed the defendant that the gun would be taken into police property.  [Govt. Ex. 8 at 22:59:12-22:59:18].  The defendant then said that, whoever owns the gun, it was "clean." [Govt. Ex. 8 at 22:59:18-22:59:30].  The officer understood this to mean that the gun was not stolen, which a check showed was true.  [Doc. 56 at 130-31].  Officer Paniagua again asked if the gun was defendant's, which the defendant again denied. [Govt. Ex. 8 at 22:59:18-22:59:30].

In the minutes that followed, the defendant called out to the officers and asked if they could just write him a ticket rather than arresting him on the suspended license charge; asked about Damien driving his car; asked questions and made statements about bonding out and his pending suspended license charge; and called out to Damien to get his money and paperwork.  [Govt. Ex. 8 at 22:59:30-23:03:43, 23:03:43-23:05:56].

The officers did not run defendant's or the passengers' criminal histories, and since none of the car occupants claimed ownership of the gun, it was taken into police

5

property.  [Doc. 56 at 121-22].  After the officers searched the Honda, Officer Paniagua released the Honda to Damien and the officer drove the defendant to the College Park Jail.  [Doc. 56 at 132, 134].  The officer continued to smell a strong odor of marijuana coming from the defendant during the drive.  [Doc. 56 at 135].  Once at the jail, he told the defendant that he could face additional charges if he brought marijuana inside.  [Doc. 56 at 135].  The defendant then admitted that he had marijuana between his legs and provided it to the officer.  [Doc. 56 at 136-37].  Normally, the defendant would have been searched by jail personnel, but here, Officer Paniagua searched him instead and found nothing else.  [Doc. 56 at 137-38].

## B.    The March 20, 2017 Traffic Stop and Arrest

On  March  20,  2017,  at  around  9:30  a.m.,  then  Lovejoy  Police  Department Officer Marqutte Simmons was on patrol when he saw that the driver of a 2002 Honda Civic traveling towards him was not wearing a seatbelt (a violation of Georgia law).  [Doc. 56 at 53-57].  Officer Simmons turned around and got behind the Honda as it pulled into a subdivision.  [Doc. 56 at 57; Govt. Ex. 6].  He called in the license plate to his dispatch and activated the lights and sirens in his patrol car, which also activated the video and audio recording equipment in the car.  [Doc. 56 at 35-36, 57, 78-79].  Unlike the previous stop with Officer Paniagua, Officer Simmons was wearing a

6

microphone that recorded the interactions outside the patrol car.  [Doc. 56 at 78-79; Govt. Ex. 1].

The driver of the Honda—the defendant—was the only person in the car at that time.  [Doc. 56 at 57, 61].  But just after pulling over, the defendant moved an object from the front passenger seat to the backseat of the car, and Tyshauna Reid[2] entered the Honda on the passenger side.  [Doc. 56 at 57-59, 81; Govt. Ex. 1 at 0:42-0:45].  Reid lived on that street and the defendant was picking her up.  [Doc. 56 at 57-59, 81; Govt. Ex. 1 at 0:42-0:45].  She was carrying some cords and small items, but nothing larger and no bag of any kind.  [Doc. 56 at 60, 80; Govt. Ex. 1 at 0:42].

Officer Simmons approached the Honda on the driver's side.  [Doc. 56 at 60; Govt. Ex. 1 at 0:27-50].  The defendant opened his door as the officer approached, and Officer Simmons explained that he had pulled the defendant over for not wearing a seatbelt, which the defendant acknowledged.  [Doc. 56 at 61-62; Govt. Ex. 1 at 0:47-1:05].  The defendant explained that he "was just picking her [Reid] up." [Doc. 56 at 62; Govt. Ex. 1 at 0:52-0:56].

_____

[2]     Reid met the defendant for the first time earlier that day, and they had exchanged phone numbers.  [Doc. 57 at 94-95].  He then called her and asked her if she would help him get his car to the shop, and they arranged to meet at the location where he ultimately was also pulled over.  [Doc. 57 at 95-96].

7

While standing at the driver's side door and speaking with the defendant, Officer Simmons smelled raw, unburned marijuana and Indian spray (an air freshener) coming from inside the car. [Doc. 56 at 62-64]. He then asked for the defendant's identification, called the driver's license in to police dispatch, and requested a back-up officer. [Doc. 56 at 65, 83-85; Govt. Ex. 1 at 0:57-2:00].

While he waited for a second officer to arrive, Officer Simmons stood by the defendant's door and observed the car. [Doc. 56 at 68, 69; Govt. Ex. 1]. From there, he saw a mason jar with marijuana residue on the floorboard behind the driver's seat and a backpack on the backseat. [Doc. 56 at 65-67].[3] Also at this time, the defendant called his father to come to the traffic stop, and the defendant again acknowledged that he had not been wearing his seatbelt. [Doc. 56 at 86, 88; Govt. Ex. 1 at 2:15-5:00]. Officer Simmons told the defendant that he smelled a strong odor of marijuana coming from the car. [Govt. Ex. 1 at 3:03]. He asked the defendant if he had marijuana in the vehicle or had smoked marijuana, which he denied. [Doc. 56 at 67, 89]. The defendant

---

[3]    The officer also testified that he saw marijuana residue on the center console as well as a can of Indian spray and sandwich bags in the open glove box at this time. [Doc. 56 at 65-67]. However, the defendant disputes whether there was residue on the center console and whether the glove box was then open.

8

suggested that the officer was smelling "this [Indian spray]," and showed the can to the officer.  [Doc. 56 at 67, 89].

Then-Interim Chief (now Chief) Wayne Woods of the Lovejoy Police Department arrived as back-up about six minutes into the stop.  [Doc. 56 at 33-34, 36-37, 67-68; Govt. Ex. 1 at 5:50].  Officer Simmons signaled Chief Woods to approach him because he intended to conduct a probable cause search of the car for marijuana.  [Doc. 56 at 68; Govt. Ex. 1 at 5:46].  Officer Simmons then asked the defendant again if there was any marijuana in the car, which he denied and again suggested that the only thing he was smelling was "this [the Indian spray]."  [Gov. Ex. 1 at 5:52-6:16].  Officer Simmons instructed the defendant and Reid to get out of the car and began searching the car while Chief Woods stood with the defendant by the patrol car.  [Doc. 56 at 40, 69-70; Govt. Ex. 1 at 6:11-7:20].  Officer Simmons found a mason jar containing marijuana residue on the floorboard behind the driver's seat and put it on the trunk of the Honda.  [Doc. 56 at 41, 70-71; Govt. Ex. 1 at 7:13].  He then searched the backpack on the backseat, which he saw contained another mason jar with two bags of marijuana inside after unzipping the bag.  [Doc. 56 at 41, 42, 71].  The officers then placed the defendant in handcuffs and told him that he was under arrest for possessing marijuana.  [Doc. 56 at 71, 75, 91; Govt. Ex. 1 at 7:20-8:00].

9

Officer Simmons got his cellphone from his patrol car, continued searching the Honda, and took several pictures of inside the car, which included (1) the unzipped backpack on the backseat, (2) the mason jar with marijuana and a smaller black zipped bag or pouch inside the backpack, and (3) sandwich bags and the can of Indian spray inside the glove box.  [Doc. 56 at 72-78; Govt. Ex. 1 at 8:30-15:00; Govt. Exs. 2-5].  No pictures were taken of marijuana residue on the center console.  [Doc. 57 at 21-22].  The officers also found the Glock firearm that the defendant is charged with possessing in this case, which is the same gun found in the car during the November 2016 traffic stop.  [Doc. 56 at 41, 75-76, 120-21; Govt. Ex. 1 at 9:10-12:00].[4]  The officers also found a digital scale typically used to weigh marijuana, which Officer Simmons believed was found in the backpack, but he could not recall for sure. [Doc. 56 at 77].  While searching the backpack, and before searching the front seats of the Honda, Officer Simmons told Chief Woods that he had seen sandwich bags in the glove compartment.  [Govt. Ex. 1 at 6:11-9:40].[5]

---

[4]     The officers do not recall where the firearm was found, but the government contends it was found in the black zipper pouch located inside the backpack.

[5]     The defendant contends that the government has failed to show that the glove box was open when Officer Simmons says he saw the Indian spray and sandwich bags. The government contends that the second time the defendant suggested the spray was the odor that Officer Simmons smelled, the sound of the defendant closing the glove box can be heard on the audio recording, indicating it was previously open.

AO 72A
(Rev.8/8
2)

After searching the Honda, Officer Simmons asked Reid if she wanted to write a statement to explain that she had just gotten in the car when the traffic stop began and make clear that none of the illegal items found in the car belonged to her, and she agreed to do so.  [Govt. Ex. 1 at 16:12-22:00].  Officer Simmons also asked Reid if she smelled marijuana when she got in the car, to which Reid responded "I smelled the spray, I don't know about the marijuana part." [Govt. Ex. 1 at 20:25-20:40].  Officer Simmons told her and Chief Woods that he smelled marijuana as soon as he walked up to the car.  [Govt. Ex. 1 at 20:50-21:00].  Chief Woods testified at the evidentiary hearing that he did not recall smelling marijuana or air freshener, and that he did not get very close to the Honda.  [Doc. 56 at 39, 90].

The defendant asked Reid to take the Honda for him, and Officer Simmons drove the defendant to the station to complete paperwork and then to the Clayton County Jail. [Doc. 56 at 97-98; Govt. Ex. 1 at 14:57-15:15, 18:54-19:15].  Officer Simmons did not try to question the defendant in the car, but the defendant called out a few times, including saying that the firearm was not his.  [Doc. 56 at 98-99].

Both Officer Simmons and Chief Woods had extensive prior experience with marijuana and had encountered both raw and burnt marijuana many times. [Doc. 56 at 42-25, 62-64, 66-67].  They explained at the evidentiary hearing that raw

11

and burnt marijuana have distinctive smells and even just marijuana residue also gives off an odor.  [Doc. 56 at 43-43, 62-63].  They also explained that glass mason jars like those found in the Honda are commonly used to transport marijuana, but they do not completely mask the odor, particularly with some of the stronger forms of marijuana often seen on the street today.  [Doc. 56 at 43-44, 63-65].

Reid testified that she met the defendant for the first time earlier that day, and that they had exchanged phone numbers.  [Doc. 57 at 94-95].  He then called her and asked her if she would help him get his car to the shop, and they arranged to meet at the location where he was ultimately pulled over.  [Doc. 57 at 95-96].  She also testified that when she got into the Honda, the glove box was not open, that it was still closed when Officer Simmons asked her to step out of the car, and that the air freshener was in a cup holder in between the front driver and passenger seats.  [Doc. 57 at 97-98].  Also according to her testimony, there was a "clean," "fresh" smell inside the Honda, as if the air freshener had been sprayed at some point that day but not "just sprayed[,]" the car did not smell like raw or burnt marijuana, and she would have recognized that smell of raw or marijuana.  [Doc. 57 at 99, 103, 106-07].  Though contradicted by the video recording, Reid also testified that Officer Simmons told her to write a statement

12

but did not tell her why he was asking her to do so, and that Officer Simmons never asked her if she smelled marijuana that day.  [Doc. 57 at 99, 105-08].

### C.      The October 12, 2017 Arrest and Interview

A federal arrest warrant for the defendant was issued after the Grand Jury returned the Indictment in this case for charges based on the March 20, 2017, traffic stop.  [Doc. 56 at 166-67; Govt. Ex. 9].  On October 12, 2017, four ATF agents assembled at the Clayton County courthouse, along with at least two Clayton County court security officers, to execute the warrant because the defendant had a scheduled court appearance at 8:30 a.m. that day.  [Doc. 56 at 166, 168-70].  Upon his arrival at about 9:00 a.m., the agents made contact with the defendant, showed him the federal arrest warrant, and escorted him downstairs to a private room in the sheriff's office.  [Doc. 56 at 170, 173-174; Govt. Ex. 9].  The defendant had his two young children with him, and he was allowed to make several calls from his cellphone and from a landline in the private room downstairs to make arrangements for someone to pick up his children.  [Doc. 56 at 170, 174].  He was not placed in handcuffs during this time.  [Doc. 56 at 170-71, 177].

The ATF agents were not wearing clothing that identified them as federal agents.  [Doc. 56 at 168, 171-172].  Special Agent Karen Hendrix is not sure if she was even

13

armed with a firearm that day because they were inside the county courthouse, but if she was armed, it was not visible.  [Doc. 56 at 172-73].  Likewise, if the three other ATF agents were armed, those firearms were not visible to anyone.  [Doc. 56 at 173].  The Clayton County officers who were assisting were in full officer uniform, including a firearm.  [Doc. 56 at 172].  Otherwise, no firearms were visible during any interaction or conversation with the defendant, and none of the officers gestured at their weapons.  [Doc. 56 at 173, 177, 184].   The conversations with the defendant, which Agent Hendrix recorded from her cellphone, were generally "laid back" and conversational in nature.  [Doc. 56 at 175, 179; Govt. Ex. 10].

After the defendant had been escorted to the interview room downstairs and finished his phone calls, Agent Hendrix read him his *Miranda* rights and asked him if he was willing to speak with them.  [Doc. 56 at 174-175; Govt. Ex. 10, file 1272 at 0:03-3:12].  The defendant acknowledged that he understood his rights and indicated that he would not speak with the agents until after someone picked up his children.  [Doc. 56 at 174-75; Govt. Ex. 10, file 1272 at 3:12-3:26].  Specifically, when asked if he would waive his rights and speak to the agents, the defendant stated,  "No, but can I just wait until, until my dad come get them [his children]."  [Govt. Ex. 10, file 1272 at 3:15-3:24].

14

Several minutes followed before the defendant's father arrived and, in the meantime, another agent referenced the defendant's two previous traffic stops in the context of seeking consent to search his car in the courthouse parking lot.  [Govt. Ex. 10, file 1273 at 2:12-2:50, 3:33-3:50].  This exchange occurred after the defendant asked if the agents could get his jacket from the car.  [Govt. Ex. 10, file 1273 at 2:12-2:50, 3:33-3:50].  When discussing consent to go into the car, the agent indicated that they could get a federal search warrant if the defendant did not give consent, and the defendant made statements about the College Park stop, essentially indicating that he did not recall or otherwise think that stop occurred.  [Govt. Ex. 10, file 1273 at 2:12-2:50, 3:33-3:50].

After several minutes, the defendant's father arrived for the children, and the defendant then asked Agent Hendrix if she wanted to go ahead and talk.  [Doc. 56 at 178, 179; Govt. Ex. 10, file 1273 at 6:45].  Agent Hendrix then asked if he wanted to talk at that point, and he responded, "yeah I told [Agent Hendrix] when my kids were gone."  [Govt. Ex. 10, file 1273 at 6:50-6:55].  Agent Hendrix did not read him his *Miranda* rights again, but she asked if he wanted to speak with them and if he was willing to do so without an attorney present.  [Doc. 56 at 179; Govt. Ex. 10, file 1273 at 6:45-7:10].  The defendant asked her what the difference would be if he had an

15

attorney present, and Agent Hendrix responded by saying, "You tell me," and said that she had previously read him his rights. [Govt. Ex. 10, file 1273 at 6:58-7:08]. The defendant then agreed to speak with them, and Agent Hendrix asked him about the firearm he possessed during the traffic stop on March 20, 2017. [Doc. 56 at 179; Govt. Ex. 10, file 1273 at 6:45-7:10].

During the interview that followed, the defendant made several statements about the Honda and to whom the firearm belonged, and he denied knowing that a firearm was in the car during either traffic stop. [Doc. 56 at 183; Govt. Ex. 10, file 1273 at 7:10-10:48]. After a few minutes, the defendant stated that he did not want to speak with Agent Hendrix anymore and the interview was concluded at 9:50 a.m. [Govt. Ex. 10, file 1273 at 10:48-11:02]. After the interview was over, the defendant was handcuffed and the agents prepared to drive him to the federal courthouse. [Doc. 56 at 177, 184].

## II.    Discussion

The defendant's motions to suppress the statements and evidence involve all three incidents—the traffic stop and arrest on November 28, 2016; the traffic stop and arrest on March 20, 2017; and the arrest and interview on October 12, 2017. The undersigned will address each of these incidents in turn.

16

**A.      The November 28, 2016 Traffic Stop and Arrest**

**1.      The Contentions of the Parties**

The defendant's motions to suppress as to the November 28, 2016 traffic stop and arrest initially sought to suppress: (1) statements made by the defendant during the traffic stop; (2) evidence of the gun found during the traffic stop; (3) statements made by the defendant after arriving at the jail; and (4) evidence of the marijuana obtained from the defendant at the jail.  [Docs. 17, 18, 26, 27].  The government has agreed that it will not seek to introduce the statements made by the defendant at the jail.  [Doc. 56 at 162-63; Doc. No. 58 at 7].   And the defendant, while not conceding to the admissibility of these items at trial, has also conceded that the gun and the marijuana are not due to be suppressed on Fourth Amendment grounds.  [Doc. No. 61 at 18-19].  Accordingly, the only issue remaining as to the November 28, 2016, traffic stop is whether to suppress the defendant's statements that were made after being placed in the officer's patrol car.

The government concedes that the defendant was in police custody when placed in the patrol car and that he was not advised his *Miranda* rights at any time by Officer Paniagua.  However, it argues that many of the defendant's statements are admissible because *Miranda* was not required.  Specifically, the government argues that certain

17

statements by the defendant were not made in response to a question or statement by the officers that was "reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  The government argues that this is the case for the defendant's statement that the gun found in the Honda was "clean."  In doing so, the government divides several statements made over the course of about twenty-five seconds.  First, Officer Paniagua asked the defendant, "is this your Glock?" and he responded "nah, nah, that's my cousin's car."  [Govt. Ex. 8 at 22:59:04-06].  The defendant then asked the officer if he would let "Damien drive my car."  [Govt. Ex. 8 at 22:59:08-22:59:12].  Officer Paniagua said "yeah" and then informed the defendant that the gun would be taken into police property.  [Govt. Ex. 8 at 22:59:12-22:59:18].  The defendant then said that, whoever owns the gun, it was "clean."  [Govt. Ex. 8 at 22:59:18-22:59:30].  Officer Paniagua again asked if the gun was the defendant's, which the defendant again denied.  [Govt. Ex. 8 at 22:59:18-22:59:30].

The government concedes that both instances when the officer asked the defendant if he owned the gun fall under *Miranda* and has indicated that it does not intend to introduce those statements at trial.  [Doc. 58 at 30-31].  However, it argues that the officer was not soliciting information or questioning the defendant when responding that Damien could take the car and mentioning that the gun would have to

18

stay with the police.  According to the government, the tone and context show that this was "simply a for-your-information kind of statement" rather than some type of question or interrogation tactic.  [Doc. 62 at 2].  Therefore, it argues, the defendant's statement that whoever the gun belonged to, it was "clean," was simply volunteered by the defendant and is admissible.

The government similarly argues that the defendant's remaining statements in the patrol car are admissible.  The government recognizes that the officers' statements are less audible during this time frame.  However, it argues that the defendant's statements are clearly heard and that the content and context show that he was not responding to police questioning or any statements intended to illicit an incriminating response.  The government notes that these statements involved the defendant engaging in casual conversation on various topics, "calling out" to Damien about driving the Honda, trying to get an estimate from the officers on how much bond would be for the suspended license charge, and asking Damien to get his money and paperwork for him.  [Doc. 62 at 3-4].  Therefore, *Miranda* was not required and these statements are admissible.

The defendant counters as to both sets of statements.  First, he argues that his statement about the gun being "clean" cannot be singled out for *Miranda* purposes.

According to the defendant, his statement was part of a single, twenty-five second conversation initiated by the officer by asking the defendant, "Is this your Glock?" [Doc. 61 at 20].  He concludes that each statement that followed in the exchange is part of the same line of questioning, and that finding otherwise due to the "brief interjection" about Damien driving the Honda would "ignore the normal course of conversation."  [Doc. 61 at 20-21].

As to his other statements in the patrol car, the defendant contends that the government has not shown that the statements were voluntarily made, which *Miranda* requires.  *Jackson v. Denno*, 378 U.S. 368, 376-377 (1964).  He argues that the audio recording is "too unclear" as to what the officers were saying to sufficiently determine whether *Miranda* was satisfied.  [Doc. 61 at 21].  In the absence of such a showing, and because the defendant was not given any *Miranda* warnings, the statements are not admissible.

## 2.    Analysis

The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself."  U .S. Const. Amend. V.  The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), held that the Fifth Amendment requires "the exclusion of incriminating statements obtained during custodial

20

interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it." *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984). "[F]ailure to give the prescribed [*Miranda*] warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004) (plurality opinion).

*Miranda* does not apply, however, "outside the context of the inherently coercive custodial interrogations for which it was designed." *Murphy*, 465 U.S. at 430 (internal quotation marks omitted). "Interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) ("Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."). " 'Voluntary and spontaneous comments by an accused . . . are admissible evidence if the comments were not made in response to government questioning." ' *United States v. Sanders*, 315 Fed. Appx. 819, 823 (11th Cir. Feb. 24, 2009) (quoting *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991)); *see also Miranda*, 384 U.S. at 478. The

AO 72A
(Rev.8/8
2)

defendant bears the burden to show that he was in custody and subjected to governmental questioning.  *See United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)[6] ("[I]f a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination."); *United States v. Peck*, 17 F. Supp. 3d 1345, 1353-54 (N.D. Ga. 2014) (gathering authority).

The undersigned concludes that the defendant's statements are not subject to suppression because his statements were made voluntarily and not in response to police questioning.  First, the defendant's statement that the gun was "clean" was not in response to questioning by Officer Paniagua.  When the defendant first denied that the gun was his, the officer did not pursue the question any further.  Instead, after the defendant asked if Damien could drive the Honda, Officer Paniagua said that he could and advised the defendant that, even though the Honda could be driven away, the gun would have to stay with the police.  The undersigned finds that this was not intended to illicit an incriminating response, but that the officer was merely clarifying what Damien could (and could not) take with him when driving the Honda from the scene.

---

[6]     Decisions of the Fifth Circuit rendered on or before September 30, 1981, are binding precedent in the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

AO 72A
(Rev.8/8
2)

*See Innis*, 446 U.S. at 302 n.7 (the intent of the police is relevant and may have bearing on whether the police should have known their words were reasonably likely to evoke an incriminating response).

Second, the government has provided sufficient evidence to find that the remaining statements by the defendant in the patrol car were not in response to police questioning.  It is true that the quality of the audio recording could be clearer as to what the officers were saying.  However, the defendant's statements are more easily heard on the recording and sufficiently show that they were not made in response to statements or questions intended to illicit incriminating responses, but were generally regarding logistical matters.  As a result, apart from those statements which the government concedes are inadmissible, the defendant's statements made while in the patrol car on November 28, 2016, are not due to be suppressed under *Miranda*.

## B.    The March 20, 2017 Traffic Stop and Arrest

### 1.    The Contentions of the Parties

The defendant concedes that initiating the March 20, 2017, traffic stop was justified by his failure to wear a seatbelt.  [Doc. 62 at 21-22].  However, he argues that the ensuing search of the vehicle was not supported by probable cause and constitutes unreasonable delay of the traffic stop.   The government argues that the requisite

23

probable cause was supported by Officer Simmons' belief that he smelled marijuana coming from the Honda, and by his observations of the empty sandwich bags in the glove box, the marijuana residue on the center console, and the mason jar on the floor board containing marijuana residue.

In response, the defendant challenges the credibility of Officer Simmons. In particular, he challenges the officer's credibility in claiming that he smelled marijuana when he first approached the defendant during the traffic stop. The defendant finds it "[i]nexplicabl[e]" that Officer Simmons testified that the smell of marijuana got stronger as he stood by the open driver's side door because "scent usually dissipates in open air." [Doc. 61 at 22]. He cites to Reid's testimony at the evidentiary hearing, in which she stated that she did not smell marijuana, and to Chief Woods' testimony that he could not recall smelling marijuana. He also cites previous instances from Officer Simmons' police record as establishing that the officer is not credible, which the undersigned has reviewed and weighed in making this final report and recommendation.[7]

---

[7]     The defendant points to negative responses by Officer Simmons during polygraphs taken for his 2009 and 2010 applications to the Clayton County Police Department, his resignation from his first law enforcement position after a disagreement with a superior officer, and his resignation from the Clayton County Police Department in 2015 during an investigation about a car accident he was in while

24

Unlike Officer Simmons, the defendant argues that there is no reason to question Reid's credibility because she has no previous or subsequent connection with the defendant, and any errors in her testimony compared to the video footage are understandable because she did not review the video. The defendant asserts that, because the officer could not actually smell marijuana, there was no probable cause or reasonable suspicion to search the car or otherwise further delay the defendant by continuing the traffic stop.

The defendant also argues that Officer Simmons did not actually see the sandwich bags in the glove box or any marijuana residue on the center console before conducting the search. According to the defendant, the government has failed to show that the glove box—which the officer said was open and contained empty plastic bags and Indian spray—was open when he approached the car. He similarly asserts that there was no marijuana residue on the center console, which the officer testified that he recalled seeing after pulling over the defendant. For support, he cites to the testimony of both Reid and Simmons, and the lack of photo or other evidence of residue on the center console. Reid testified that the glove box was closed, and Officer Simmons was unable to recall exactly where he saw the residue or other details about the center

_____

on duty.

25

console.  The defendant further posits that the officer could have opened the glove box himself by reaching from the open driver's door—meaning that it was not in his view until after he began the search.  [Doc. 61 at 28].

The government counters that the Officer Simmons' testimony that the smell grew stronger is reasonable because he was standing by the front driver's side door, which was "the only pathway the marijuana smell had to leave the car."  [Doc. 62 at 4]. As to credibility, the government argues that Officer Simmons' record does not justify finding him not credible, particularly as to the March 20, 2017, traffic stop.  It agrees with the defendant that there is no reason to question the credibility of Chief Woods, but the government then argues that his statements actually support Officer Simmons' account.  It cites Chief Woods' testimony that, although he did not smell marijuana himself, he did not get very close to the car and did not "at all" question or disbelieve Officer Simmons.  [Doc. 62 at 9].

The government also counters that it is Reid who should not be found credible. It argues that Reid was not truthful at the evidentiary hearing about whether the glove box was open or whether the car smelled like marijuana.   The government cites her testimony that Officer Simmons did not ask her if she smelled marijuana, that he did not explain to her why he asked her to write a statement, and that she did not mention

AO 72A
(Rev.8/8
2)

anything about smelling the Indian spray and was unsure about smelling marijuana—all of which are contradicted by the video evidence.  [Doc. 62 at 9; Doc. 58 at 24-26].

As to the glove box, the government argues that the second time the defendant said that the only smell in the car was the Indian spray, "the video shows [the defendant] reaching over toward the glove box, and a closing sound can clearly be heard."  [Doc. 58 at 25].  The government also cites the video footage showing that Officer Simmons told Chief Woods about the sandwich bags in the glove box before searching the Honda from the passenger side.  Although the defendant blocks the video footage of which door Officer Simmons entered when first searching the driver's side, the video shows the officer retrieving items from the back of the car and then placing the mason jar from the floorboard on the back of the car.  From there, the government asserts that the video "shows Officer Simmons methodically going around to each door of the Honda and searching from each door and then the trunk of the car."  [Doc. 62 at 10].  In other words, the government argues that while it was possible for Officer Simmons to open or close the glove box from the driver's side, the video shows that it did not happen.  As to the marijuana residue on the center console, the government also cites Officer Simmons' testimony that he could not recall additional details about the console because he was focused on the residue itself "over the color, layout, and

27

material of the console." [Doc. 62 at 11 n.10].

### 2.    Analysis

The Fourth Amendment protects people against unreasonable government searches and seizures that intrude on their reasonable expectations of privacy. U.S. Const. amend. IV; *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *United States v. Place*, 462 U.S. 696, 706-07 (1983). Accordingly, a search or seizure must normally be conducted under the authority of a court-issued warrant, supported by a finding of probable cause to believe that evidence of a crime will be found in the targeted location. *Skinner v. Ry. Labor Execs' Ass'n*, 489 U.S. 602, 619 (1989); *Mincey v. Arizona*, 437 U.S. 385, 390 (1978). " '[S]earches conducted outside the judicial process . . . are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions.' " *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted)); *see also United States v. Campbell*, 920 F.2d 793, 795 (11th Cir. 1991) ("A search without a warrant based on probable cause is illegal, unless the government can show that it falls into one of those limited exceptions recognized by law.").

"Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the

28

AO 72A
(Rev.8/8
2)

prosecution. The [g]overnment must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (citation omitted). The burden to establish the application of the warrant exception is by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.") (citing *Lego v. Twomey*, 404 U.S. 477, 488-89 (1972)). A preponderance of the evidence simply means an amount of evidence that is enough to persuade the Court that the existence of a fact is more probable than its non-existence. *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997).

Among the well-delineated exceptions to the warrant requirement established by the Supreme Court is the "automobile exception." Under the automobile exception, "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996); *see also United States v. Virden*, 488 F.3d 1317, 1321-22 (11th Cir. 2007) ("[T]he search and seizure of vehicles without a warrant is permissible when the police have probable cause to believe a vehicle

contains contraband.") (citations omitted). No separate exigent circumstances need to be shown. *See Maryland v. Dyson*, 527 U.S. 465, 466 (1999). The validity of the search turns on whether there was probable cause to believe the vehicle contained contraband or evidence of a crime. *Id.*

In addition, a traffic stop must last "no longer than is necessary to effectuate the purpose of the stop," and "the scope of the detention must be carefully tailored to its underlying justification." *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999) (quotations and alteration omitted). "Ordinarily, when a citation or warning has been issued and all record checks have been completed and come back clean, the legitimate investigative purpose of the traffic stop is fulfilled." *United States v. Simms*, 385 F.3d 1347, 1353 (11th Cir. 2004). Because a traffic stop " 'is more analogous to an investigative detention than a custodial arrest . . . [the Court] analyze[s] the legality of these stops under the standard articulated in *Terry v. Ohio*, 392 U.S. 1 (1968).' " *United States v. Gonzalez*, 275 Fed. Appx. 930, 932 (11th Cir. May 2, 2008) (quoting *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (citations omitted)). Accordingly, " 'an officer's actions during a traffic stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place.' " *Id.* (quoting *Purcell*, *id.*, and *Terry*, 392 U.S. at 20). An officer's prolonging of a traffic

AO 72A
(Rev.8/8
2)

stop beyond its initial purpose is reasonable when there is "an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring," or if the driver consents. *Pruitt*, 174 F.3d at 1220.

"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). A court, as fact finder, evaluates the credibility of a witness by considering, *inter alia*, the internal consistency of the witness's testimony, the witness's candor, the witness's demeanor on the stand, and the interests of the witness. *See id.*; *see also Gallego v. United States*, 174 F.3d 1196, 1198 (11th Cir. 1999). A reviewing court will defer to "the magistrate judge's credibility determinations unless his understanding of the facts appear to be 'unbelievable,' "i.e., the magistrate judge's credibility determination "is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." *Ramirez-Chilel*, 289 F.3d at 749 (citation omitted).

The undersigned concludes that the search of the Honda is not due to be suppressed because it was supported by probable cause and that there was no unreasonable delay in conducting the traffic stop. To begin, probable cause to search

31

exists when an officer smells marijuana coming from the vehicle. *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc) ("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana."); *United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982) ("[T]he recognizable smell of marijuana gives rise to probable cause supporting a . . . search."); *see also United States v. Salley*, 341 Fed. Appx. 498, 500 (11th Cir. Aug. 5, 2009) (holding strong scent of marijuana furnishes reasonable suspicion for continued detention and that the smell of marijuana also satisfies the higher probable cause standard.).  Here, the officer smelled marijuana almost immediately after pulling the defendant over and speaking with him next to the open car door about the seat belt offense.  And, based on the video evidence and testimony in this case, the undersigned finds the officer's statement that he smelled marijuana to be credible.

This is supported by the fact that Officer Simmons could observe the mason jar with marijuana residue on the back floorboard, which was recovered, and that the officers found unburned marijuana in the backpack on the backseat of the car.  Reid's statements and testimony do not meaningfully call Officer Simmons' credibility into

32

question given that her testimony as to many aspects of the incident are contradicted by the video evidence.

The government has also provided sufficient evidence to support Officer Simmons's statement that the glove box was open, leaving the sandwich bags in view. The officer did not search the passenger side of the Honda before telling Chief Woods about the sandwich bags. The defendant's assertion that the officer opened the glove box by reaching from the driver's side is based on mere possibility. Meanwhile, the video evidence tends to show that the officer had only searched the backseat of the car at that point. Although there is no photo or video footage confirming the officer's testimony about residue on the center console, the officer's account of the incident is generally supported by the audio and video evidence.

In sum, because the search was supported by probable cause (the smell of marijuana), as was any delay in the traffic stop, the search of the Honda was lawful and not subject to a motion to suppress.

### C.     The October 12, 2017 Arrest and Interview

#### 1.     The Contentions of the Parties

The defendant also moves to suppress his statements made during the interview following his arrest on October 12, 2017 and evidence from the search of his vehicle

AO 72A
(Rev.8/8
2)

in the courthouse parking lot that occurred that day.  The government has indicated that it will not seek to introduce evidence from the vehicle search in its case-in-chief. [Doc. 58 at 2 n.2].  Accordingly, the question is whether to suppress the defendant's statements during the interview following his arrest on October 12, 2017.

The defendant argues that he did not voluntarily or knowingly waive his *Miranda* rights, making his statements inadmissible.  First, he argues that the alleged waiver was not voluntary.  He did not begin talking with Agent Hendrix until about twenty-five minutes after he first told her to wait until his children were picked up.  He argues that, in the meantime, the federal agents' discussions with him about whether and how to retrieve his jacket from his car had a coercive and deceptive effect, and that this is true regardless of the agents' intent.  He also asserts that the agents' conversation with him about getting his jacket re-started the interview such that his later conversation directly with Agent Hendrix falls under the same inadmissible line of questioning.  [Doc. 61 at 30-31].

In addition, the defendant argues that the waiver was not made knowingly because he was confused about the consequences of doing so.  According to the defendant, asking Agent Hendrix if having an attorney present would make a difference shows his lack of understanding.  He argues that continuing the conversation after

34

Agent Hendrix responded with simply "You tell me," without re-advising him of his rights or otherwise answering the question similarly shows that he did not fully appreciate "the nature of his rights or the consequences of waiving them." [Doc. 61 at 31].

The government argues that the defendant was properly read his *Miranda* rights, acknowledged that he understood them, and agreed to talk once his father had picked up his children. And while the agents did bring up both traffic stops when discussing getting his jacket out of the car, the conversation was actually re-initiated by the defendant when he asked "so do you wanna talk now?" [Doc. 62 at 13]. Agent Hendrix then asked if he wanted to talk at that point, and he responded, "yeah I told [Agent Hendrix] when my kids were gone." [Gov't Ex. 10, file 1273 at 6:50-6:55]. The government also cites to testimony that the conversation was not deceptive, but cordial and "laid back." [Doc. 62 at 12]. The government also contends that the defendant was aware of the rights he was waiving. It cites the defendant's testimony after Agent Hendrix said that she had already read him his rights, when he immediately responded that they could go ahead and talk and that it was "no problem." [Govt. Ex. 10, file 1273 at 6:55-7:10]. According to the government, nothing further was required of Agent Hendrix to show that the defendant knowingly waived his rights. *Towne v.*

35

*Dugger*, 899 F.2d 1104, 1107 (11th Cir. 1990).

### 2.     Analysis

As noted above, the Fifth Amendment places upon the government the burden of showing that the defendant's statements during custodial interrogation were obtained in compliance with the dictates of *Miranda*, and were otherwise voluntary.  *Colorado v. Connelly*, 479 U.S. 156, 168 (1986); *Miranda*, 384 U.S. at 475.  In *Moran v. Burbine,* 475 U.S. 412 (1986), the Supreme Court explained the two-part inquiry into whether a defendant's waiver of *Miranda* rights was voluntary, knowing, and intelligent.  First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.  *Id.* at 421 (quotes and citations omitted).

The Fifth Amendment inquiries are related: did the defendant voluntarily waive his rights to remain silent and consult with an attorney before answering Agent Hendrix's questions, and were his statements otherwise voluntary.  Because the

36

defendant was read his *Miranda* rights, the court does not have to analyze whether he was "in custody" under the Fifth Amendment and thus entitled to them.

Under the totality of the circumstances, the undersigned concludes that the defendant's waiver was made voluntarily and knowingly. The defendant was not placed into handcuffs until after he ended the interview, and he was given the opportunity to make phone calls to arrange for his children to be picked up. The testimony and video evidence indicate a relaxed atmosphere during the arrest and interview. Further, though he at first declined to speak with the officers after being read and acknowledging his rights, the defendant indicated he would talk once his children were picked up. When that happened, he was the first to suggest that they could then talk. Although an agent brought up the two traffic stops in the meantime, that was in the context of whether and how to retrieve the defendant's jacket from his car, which he had requested. All interrogations by police officers involve a necessary factor of intimidation. The question is whether it was excessive in order to overbear the will of the person being questioned to resist. There is no evidence in this case of any coercion either in the process that would render the defendant's waiver involuntary.

The defendant's waiver was also made knowingly. He stated that he understood his rights after they were read to him by Agent Hendrix. He also demonstrated

AO 72A
(Rev.8/8
2)

awareness and understanding of his rights several times.  First, when he declined to speak with the agents until his children were gone.  Second, when he offered to talk after his children were picked up, indicating that it was "no problem" to proceed without his attorney.  [Govt. Ex. 10, file 1273 at 6:55-7:15].  And third, when he ended the interview after a few minutes of speaking with Agent Hendrix.  Meanwhile, there is no evidence in this case of any deception or confusion about the defendant's rights.  Although the defendant faults Agent Hendrix for merely stating "You tell me," and reminding him that she read him his rights when he asked if having an attorney would make a difference, the agent was not required to do more.  *Towne*, 899 F.2d at 1107 (finding no violation when the defendant asked the officer if he thought he needed a lawyer and no attempt was made by the officers "to clarify or discuss in any way [the defendant's] inquiry regarding getting a lawyer" and the officers instead began to make accusatory statements to the defendant).  Accordingly, there was no Fifth Amendment violation as to the interview.

## IV.   Conclusion

Accordingly, the undersigned **RECOMMENDS** that the defendant's motions to suppress evidence and statements [Docs. 17, 18, 26, 27] be **GRANTED IN PART and DENIED IN PART**. It is **RECOMMENDED** that the defendant's motions to suppress evidence, [Docs. 17, 26], be **GRANTED** as to the search of the defendant's car following his arrest on October 12, 2017, as the government has indicated it will not seek to introduce evidence from that search in its case-in-chief.   It is otherwise **RECOMMENDED** that the defendant's motions to suppress evidence, [Docs. 17, 26], be **DENIED**.  Further, the undersigned **RECOMMENDS** that the defendant's motions to suppress statements [Docs. 18, 27], be **GRANTED** as to the statements made at the College Park Jail on November 28, 2016, which the government agreed not to seek to introduce in its case-in-chief, [Doc. 58 at 7 n.7], and to the extent that the government concedes that the statements made by the defendant while in the patrol car during the November 28, 2016, traffic stop are not admissible in the government's case-in-chief. [*See* Doc. 58 at 30-31].   It is otherwise **RECOMMENDED** that the defendant's motions to suppress statements, [Docs. 18, 27], be **DENIED**.

AO 72A
(Rev.8/8
2)

The Court has now ruled on all pretrial motions referred to it and has not been advised of any impediments to the scheduling of a trial.  Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this 6th day of December, 2018.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)